Leo A. GUTMAN and Georgia B. Gutman as Joint Tenants, and Gutman & Gutman, Inc., Plaintiffs,

v.

HOWARD SAVINGS BANK, Donald F. McCormick, Leo G. Rogers, Andrew V. Aldi and Joseph G. Wojak, Defendants.

Civ. A. No. 89–5131 (Formerly Civ. A. No. 90–2397).

United States District Court, D. New Jersey.

Oct. 11, 1990.

As Amended Nov. 27, 1990.

Jared Stamell, Bayonne, N.J. and Joseph J. Tabacco, Jr., Stamell, Tabacco & Schager, New York City, for plaintiffs.

Daniel D. Caldwell, Wolff & Samson, P.A., Roseland, N.J. and Richard H. Klapper, John B. Reid–Dodick, Sullivan & Cromwell, New York City, for defendants.

## OPINION

WOLIN, District Judge.

Defendants have moved pursuant to Federal Rule of Civil Procedure 9(b) to dismiss plaintiffs' fraud claim against defendants on the grounds that plaintiffs' averments of fraud are not sufficiently specific. Defendants move in the alternative under Rule 12(e) for a more definite statement of these averments.

Defendants have also moved to dismiss pursuant to Rule 12(b)(6). Defendants argue that plaintiffs' allegations of fraud and negligent misrepresentation fail to state claims upon which relief can be granted because plaintiffs have not alleged that they either bought or sold securities in reliance on defendants' misrepresentations. Defendants urge that plaintiffs' alleged decision to hold securities in reliance on defendants' misrepresentations does not support an actionable claim of fraud or negligent misrepresentation.

For the reasons stated herein, the Court will deny defendants' motions.

## I. BACKGROUND

Plaintiffs Leo and Georgia Gutman are residents of New York who began to accumulate substantial holdings in defendant Howard Savings Bank ("Howard") in 1986. Complaint ¶¶ 1, 3. The Gutmans bought Howard stock both for their own account and for the account of plaintiff Gutman & Gutman, Inc., a television and motion picture licensing and distribution business. Id. ¶¶ 4, 11. Gutman & Gutman, Inc. is incorporated and maintains its principal place of business in New York and its shares are owned jointly by the Gutmans. Id. ¶¶ 1, 3, 11. The Gutmans invested in Howard stock because of what they perceived as its safety and its potential for capital appreciation. Complaint ¶ 3. Id. In 1987 the Gutmans sold some of their Howard stock at a profit, but reinvested the proceeds in Howard in 1987 and 1988. Id. ¶ 4. As of April of 1989, plaintiffs held a total of 85,000 shares of Howard common stock. Id. ¶ 6.

Howard is a stock savings bank which is chartered under the laws of New Jersey and has its principal place of business in New Jersey. Id. ¶ 12. Howard has various subsidiaries which engage in various banking and other financial activities. Id. Defendant Donald McCormick, at all times relevant to the Complaint, was chairman of the Board of Directors of Howard and its Chief Executive Officer. Id. ¶ 14. Defen-

dant Leo Rogers, at all times relevant to the Complaint, was a director of Howard and an Executive Vice–President. *Id.* ¶ 15. Defendant Andrew Aldi was Executive Vice–President of Real Estate during the events alleged in the Complaint. *Id.* ¶ 16. Finally, defendant Joseph Wojak was Executive Vice–President and Chief Financial Officer during the events alleged in the Complaint. These officers of Howard are sometimes generally referred to herein as "individual defendants."

The Complaint recounts the deterioration of the price of Howard's common stock from $22.75 per share on May 4, 1989, Complaint ¶ 16, to $8.13 per share on December 12, 1990. *Id.* ¶ 69. The Complaint also tells of misrepresentations made by Howard in quarterly reports and in statements by defendants McCormick and Walter Hislop, Howard's Vice–President for Shareholder Relations. Plaintiffs complain that they were misled, beginning as early as April of 1989, as to Howard's true financial condition. *Id.* ¶¶ 5–6. "Defendants' scheme and plan to defraud plaintiffs continued until at least December, 1989," when the truth about Howard was revealed and plaintiffs finally sold their stock at great loss. *Id.* ¶ 7.

Plaintiffs have brought claims of common law fraud and negligent misrepresentation against defendants. Their case shares certain facts with a class action before this Court, *In re Howard Savings Bank Securities Litigation.* Although plaintiffs' case has been consolidated with the class action, plaintiffs are not class members because they did not purchase any shares of Howard stocks during the period at issue in the class action.

## II. DISCUSSION

### A. *The Particularity of Plaintiffs' Averments of Fraud*

 Defendants argue that plaintiffs have failed to plead fraud, and specifically the element of reliance,[1] with sufficient particularity. Defendants' Memorandum in Support of their Motion to Dismiss ("Defendants' Opening Memorandum") at 21–26. Federal Rule of Civil Procedure 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The purpose of Rule 9(b) is to place defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. *Seville Industrial Machinery Corp. v. Southmost Co.*, 742 F.2d 786, 791 (3d Cir.1984). Allegations of date, place or time fulfill these functions, but are not required so long as plaintiffs "inject[ ] some precision and some measure of substantiation into their allegations of fraud." *Id.* at 786.

 Rule 9(b) requires the identification of the elements of a fraud claim. *In re Craftmatic Securities Litigation*, 890 F.2d 628, 645 (3d Cir.1989) (citing *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99 (3d Cir.1983)). A common law fraud claim in New York or New Jersey[2] consists of the following elements: (1) a knowing misrepresentation by defendant as to a material fact; (2) defendant's intention to induce plaintiff to rely on that misrepresentation; (3) reliance by plaintiff on the misrepresentation; and (4) resulting damage to plaintiff. *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 151 N.E.2d 833, 836, 176 N.Y.S.2d 259, 262 (1958); *Jewish Center v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981). Rule 9(b) also requires that the detrimental reliance element of a fraud claim be pleaded with particularity. *Learning Works, Inc.*

---

1. For purposes of discussing the particularity of plaintiffs' pleading of fraud, the Court assumes without deciding that inaction induced by defendants' representations can establish the element of reliance in a common law securities fraud claim. The Court reaches the merits of plaintiffs' fraud claim, *see infra* Part B, only because it cannot be disposed of on Rule 9(b) grounds.

2. The law of either New York or New Jersey applies to plaintiffs' fraud claim. *See infra* Part B.

*v. The Learning Annex, Inc.,* 830 F.2d 541, 546 (4th Cir.1987) (failure to allege sufficiently the reasonableness of reliance). To survive a 9(b) motion, plaintiff must show that he or she acted upon the fraud or misrepresentation complained of. *Caballero v. Celeste,* 1989 WL 200986, at 3 (D.N.J. May 31, 1989).

Plaintiffs make the following allegation of reliance:

> Had the Gutman's [sic] not been deceived by the defendants beginning in late April 1989 but instead told the truth about Howard, they would not have relied to their detriment on such false and misleading statements and would have been able to sell their shares of Howard common stock at prices substantially above those prevailing in December, 1989 and would have done so and avoided substantially all of the actual losses plaintiffs suffered.

Complaint ¶ 9. Defendants argue that plaintiffs have failed to state with particularity the facts that would have induced them to sell during this period. Defendants' Opening Memorandum at 22.[3]

■ Defendants break down what they consider the problematic course of plaintiffs' reliance into two periods: April and May of 1989, and the summer of 1989. On April 24, 1989, Leo Gutman was invited to an analyst's meeting which was chaired by defendant. McCormick. Defendant Wojak and Walter Hislop, Howard's Vice President for Shareholder Relations, also participated in the meeting. Complaint ¶¶ 31–32. At that meeting, these Howard officers stated that Howard earnings were expected to be $.59 per share. McCormick gave Mr. Gutman

> a handout outlining Howard's performance. The defendants represented [that] loan loss reserves were adequate and

that they did not anticipate increasing the reserve for loan losses above current level in the foreseeable future. With respect to certain of its then non[-]performing loans defendants represented that "government guarantees" covered a substantial portion of the potential losses. Defendants also predicted that Howard would earn $2.80 to $3.00 per share for 1989. In short, the entire tenor of management's presentation was very positive.

*Id.* ¶ 32. At about the same time, Howard issued a press release announcing earnings of $.59 per share; a second quarter dividend of $.15 per share; and a 32.8% increase in net interest income from the same period in 1988. *Id.* ¶ 34.

On or about May 12, 1989, Howard filed its quarterly Form F–4 report with the FDIC for the first quarter of 1989. Complaint ¶ 36. This report stated that the amount of Howard's loan reserves during the first quarter was three million dollars. *Id.* ¶ 36. The F–4 report also reported that the amount of nonperforming loans was $157.8 million. *Id.* ¶ 37.

Plaintiffs state that they relied on defendants' representations on April 24 concerning $8.5 million in earnings and three million dollars in additional loan reserves. *Id.* ¶ 38. According to plaintiffs, however, defendants knowingly and recklessly underreserved by tens of millions of dollars in order to create the impression of increasing profits. *Id.* "In fact, as of April 24, 1989, the date of Howard's announcement of its First Quarter 1989 results, the Bank had no basis to report any profits." *Id.*

Thus, plaintiffs have alleged that defendants' misrepresentations concerning the amount of loan reserves and the profitability of Howard caused them to hold on to

---

**3.** Defendants also argue that "Rule 9(b) mandates that plaintiffs plead with specificity *what* information should have been disclosed, *when* it should have been disclosed, *why* they would have sold their shares of disclosure had occurred, and *how* disclosure would have affected the price of [Howard] stock at the time (in order to calculate damages)." Defendants' Opening Memorandum at 25 (emphasis in original) (relying on *DiLeo v. Ernst & Young,* 901

F.2d 624, 627 (7th Cir.1990) (requiring that the circumstances of fraud be pleaded to include "who, what, when, where, and how...."))). However, the Third Circuit Court of Appeals has held that allegations of date, place or time are sufficient, but not necessary, to satisfy Rule 9(b). *Seville Industrial Machinery,* 742 F.2d at 791. Plaintiffs need only include "some precision and some measure of substantiation...." *Id.* at 786.

stock they otherwise would have sold. *See* Complaint ¶ 9, *quoted supra.* The misrepresentations complained of began as early as April 24, and continued through mid-May. *See id.* ¶¶ 34–38.

The Court concludes that, with respect to April and May of 1989, plaintiffs have successfully identified the reliance element of their fraud claim. *See Craftmatic,* 890 F.2d at 645 (Rule 9(b) requires identification of each element). The Complaint surely places defendants on notice of the misconduct alleged by them, which is one purpose of the rule. *Seville Industrial Machinery,* 742 F.2d at 791. The other purpose of Rule 9(b), safeguarding defendants against unfounded allegations of fraud, *id.,* has also been fulfilled. Plaintiffs have done far more than alleged "fraud" against defendants; they identified specific misrepresentations in detail. Plaintiffs' reliance—their non-sale of their Howard stock—follows from these alleged misrepresentations. Plaintiffs allege that they held their stock because defendants made statements which made Howard appear profitable. *Cf. Learning Works,* 830 F.2d at 546 (no allegations to support reasonableness of reliance). While plaintiffs have not alleged what facts would have induced them to sell, *see* Defendants' Opening Brief at 24, their allegation that Howard had no basis to declare a profit on April 24, 1989, Complaint ¶ 38, implies that the revelation of this fact would have led plaintiffs to sell. This implication is buttressed by the allegation that plaintiffs did sell their stock after Howard announced a loss in December of 1989. *Id.* ¶ 7. On this record, plaintiffs' allegations concerning the April through May period are sufficiently particular to satisfy Rule 9(b).

The other period of time in which plaintiffs' allegations do not satisfy defendants is the summer of 1989, when

> Howard's common stock continued to drift slowly down in price. The Gutmans carefully monitored their investment, and were prepared to liquidate all or part of their 85,000 shares if the defendants had revealed any aspect of the problems which were known or should have been known to them at the time but not revealed for several months thereafter.

Complaint ¶ 50. Defendants point out that Howard issued general cautionary statements during the summer of 1989. Defendants' Opening Brief at 4–5 (citing Complaint ¶¶ 42, 45, 46). Thus, defendants argue, plaintiffs must actually be alleging that Howard should have revealed more than just "any aspect" of its problems. *Id.* at 25.

According to the Complaint, however, Howard did more than merely hold back information from defendant. In early June of 1989, defendant McCormick told plaintiffs' investment advisor that Howard's projected 1989 earnings were $2.80 per share. Plaintiffs relied on this statement in determining to hold their shares. Complaint ¶ 40. On or about June 15, 1989, Hislop told Mr. Gutman that, despite a recent $2.00 per share drop in Howard's common stock, Hislop expected second quarter earnings to be at least $.58 per share. Hislop also stated that Howard's book value would remain about $26.00 per share. *Id.* ¶ 41.

On or about July 10, Howard announced that its second quarter earnings had decreased relative to the previous year. *Id.* ¶ 42. Soon after that announcement, Mr. Gutman called Hislop, who stated that although "surprise" problems had arisen on two loans which had to be written down, Howard did not foresee any other writedowns for the rest of 1989. In addition, Hislop told Mr. Gutman that Howard foresaw 1989 earnings to be at least as high as 1988 earnings. *Id.* ¶ 42. Plaintiffs relied on this misrepresentation. *Id.*

The second quarter F–4 report, released on or about August 11, stated that although non-performing loans had increased relative to the previous year, reserves were sufficient. *Id.* ¶¶ 44, 47–48. It is alleged that in fact, however, reserves were inadequate; moreover, considerable uncertainty existed as to whether, as represented, the government would actually back $13.55 million in non-performing loans. *Id.* ¶ 49. Plaintiffs relied upon these and other purported false statements in the F–4 report.

*Id.* In early August, Mr. Gutman heard through his investment advisor that, according to the individual defendants, the outlook for the third quarter was positive. *Id.* ¶ 51. In mid-September Hislop told Mr. Gutman that he did not anticipate any new write-downs and that Howard would increase the dividend above $.60 per share. *Id.* ¶ 52.

Plaintiffs' allegations for the summer of 1989 thus follow the pattern established during the spring: a deteriorating situation which was imperfectly revealed in quarterly reports and then ignored in optimistic statements by individual defendants. Then the cycle would begin again with new quarterly reports. For the reasons stated *supra*, plaintiffs' allegations for the summer of 1989 are sufficient to put defendants on notice of specific instances of fraud alleged against them. Moreover, the specificity of the misrepresentations detailed in the Complaint substantiate the element of reliance.

The most troubling aspect of plaintiffs' allegations of reliance appears in ¶ 50 of the Complaint, in which plaintiffs state that they would have liquidated "all or part" of their stock during the summer of 1989 if Howard had revealed information which they intentionally withheld. This allegation elaborates slightly on plaintiffs' statement in ¶ 9 of the Complaint that, had defendants told the truth about Howard, they would have sold their shares.

■ Defendants' procedural assault anticipates that plaintiffs will have problems proving damages if they cannot specify the number of shares they would have sold if defendants had or had not told them certain things. But the purpose of Rule 9(b) is only to put defendants on notice of the specific misrepresentations alleged against them, not to test the factual support for those allegations. Therefore, the Court will deny defendants' motion to dismiss the Complaint pursuant to Rule 9(b). Likewise, due to the specificity of the allegations against defendants, the Court will deny defendants' motion for a more definite statement pursuant to Rule 12(e).

## B. *Defendants' Liability for Representations Which Allegedly Induced Plaintiffs to Hold Stock*

■ This case presents the issue of whether a complaint may state a claim for common law securities fraud in the absence of an allegation that plaintiffs either bought or sold securities in reliance on defendants' alleged misrepresentations. With respect to defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take the allegations of the Complaint as true, view them liberally, and give plaintiff the benefit of all inferences fairly drawn. *Wilson v. Rackmill*, 878 F.2d 772, 775 (3d Cir.1989); *see also Craftmatic*, 890 F.2d at 634 (facts alleged in complaint assumed true). Plaintiffs allege, as set out more fully above, that they bought a total of 85,000 shares of stock in defendant Howard and then, in reliance on individual defendants' rosy mischaracterizations of Howard's finances, held on to their stock. According to plaintiffs, had defendants not misrepresented Howard's finances, plaintiffs would have sold all or part of their Howard stock instead of holding it. Complaint ¶ 50. Plaintiffs do not allege that they either bought or sold stock in reliance on any misrepresentation made by defendants.

■ A federal district court sitting in diversity jurisdiction must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Court, in determining which state's law applies to plaintiffs' common law fraud claim, will therefore apply New Jersey choice of law principles. New Jersey has adopted the governmental interest analysis in tort cases. *E.g., Veazey v. Doremus*, 103 N.J. 244, 247, 510 A.2d 1187 (1986). In applying the governmental interest analysis,

the determinative law is that of the state with the greatest interest in governing the particular issue. The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be

determined on an issue-by-issue basis. If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.... [T]he qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply.

*Id.* at 248, 510 A.2d 1187 (citations omitted); *Barco Auto Leasing Corp. v. Holt,* 228 N.J.Super. 77, 82–83, 548 A.2d 1161 (App.Div.1988) (quoting *Veazey).* In *Veazey,* the New Jersey Supreme Court examined the Florida and New Jersey laws of interspousal immunity in the context of an automobile accident. *Id.* 103 N.J. at 247, 510 *A.*2d 1187. In the course of determining that a conflict existed and that Florida law governed, the court examined the doctrine of interspousal immunity rather than entire claim of negligence. *Id.* 103 N.J. at 248–49, 510 A.2d 1187.

In the present case, plaintiffs urge the Court to apply New York law to the issue of whether a common law securities fraud claim must include an allegation that plaintiffs bought or sold securities in reliance on defendants' misrepresentations. Plaintiffs' Memorandum in Opposition at 15–16. Defendants urge the Court to apply New Jersey law to this issue. Defendants' Opening Memorandum at 11; Defendants' Reply Memorandum of Law in Support of their Motion to Dismiss ("Defendants' Reply Memorandum") at 2–3. According to the approach mandated by *Veazey,* however, the Court must first determine the interested states and then the law of each such state. Only if there is a conflict will the Court weigh the various contacts of the interested states.

The interested states are New York and New Jersey. The Gutmans are New York residents, and Gutman & Gutman, Inc. is incorporated and has its principal place of business in New York. Complaint ¶ 1. Plaintiffs were allegedly defrauded by statements they received over the telephone while in New York, *id.* ¶¶ 41, 43, 52, 59, and at meetings in New York. *Id.* ¶¶ 31, 55. On the other hand, Howard is incorporated and has its principal place of business in New Jersey. *Id.* ¶ 1. The individual defendants are all New Jersey residents. *Id.* Moreover, the misrepresentations which plaintiffs claimed were made by telephone apparently originated in New Jersey. *See id.* ¶¶ 41, 43, 52, 59. No other state appears to have any significant connection with the alleged misrepresentations.[4]

A common law fraud claim in New York or New Jersey consists of the following elements: (1) a knowing misrepresentation by defendant as to a material fact; (2) defendant's intention to induce plaintiff to rely on that misrepresentation; (3) reliance by plaintiff on the misrepresentation; and (4) resulting damage to plaintiff. *Channel Master Corp.,* 151 N.E.2d at 836, 176 N.Y. S.2d at 262; *Jewish Center v. Whale,* 86 N.J. at 624, 432 *A.*2d 521.

Under New York law, the elements of a claim for negligent misrepresentation are (1) a careless false statement made directly by defendant to plaintiffs; (2) defendants' knowledge or notice that the statement will be acted upon; (3) defendant's intention that others rely on this misrepresentation; (4) reliance by plaintiff on the misrepresentation; (5) resulting damage to plaintiff; and (6) a duty of care owed by defendant to plaintiff. *White v. Guarente,* 43 N.Y.2d 356, 372 N.E.2d 315, 320, 401 N.Y.S.2d 474, 478 (1977). In New Jersey, "[a]n incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss ... sustained as a consequence of that reliance." *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 334, 461 A.2d 138 (1983); *followed in Karu v. Feldman,* 119 N.J. 135, 146–47, 574 A.2d 420 (1990).

The facial similarity or dissimilarity of the elements of fraud and negligent mis-

---

**4.** Plaintiff alleges that, while in California, he heard by telephone through his investment adviser about favorable information provided by the individual defendants. Complaint ¶ 51.

Given the vagueness of this allegation and the fortuitousness of Mr. Gutman's location at the time it was relayed to him, California cannot be considered an "interested state."

representation in these jurisdictions does not end the choice of law analysis, however, because the Court must determine the law that governs the specific issue before the Court. *See Veazey,* 103 N.J. at 248, 510 A.2d 1187 (any conflict to be determined on issue-by-issue basis). The specific issue before the Court is whether a plaintiff states a claim for fraud or negligent misrepresentation when the reliance alleged is plaintiff's failure to sell stock.

The parties have not cited any apposite high court decision in either New York or New Jersey,[5] and the Court has not discovered any such decision. In determining the law in these jurisdictions, therefore, the Court will heed the counsel of the Third Circuit Court of Appeals in *McGowan v. University of Scranton* that in the absence of a high court decision on point,

> we must predict how that court would decide the issue. In attempting to forecast state law, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.... Decisions of intermediate appellate courts of the state, while not conclusive, are indicia of how the state's highest court might decide the issue. In appropriate circumstances, such decisions may constitute 'presumptive evidence' of state law.

759 F.2d 287, 291 (3d Cir.1985) (quotations omitted).

1. New York Law

■ The New York Supreme Court, Appellate Division, First Department, has decided the issue before this Court. In *Continental Ins. Co. v. Mercadante,* the court considered a claim for "fraud in inducing, not the purchase of the bonds, but their retention after purchase." 222 A.D. 181,

183, 225 N.Y.S. 488 (1927). The court held that "plaintiffs cannot be denied redress because their conduct was inaction rather than action." 222 A.D. at 184, 225 N.Y.S. 488. After reviewing American and English cases, the court admitted that its holding might have extended the realm of actionable deceit but concluded that if "this be so, we think the extension is based upon a proper commercial morality and the logical import of the precedents that the purpose of the law is, wherever possible, to afford a remedy to defeat fraud." *Id.* at 187, 225 N.Y.S. 488. The Appellate Division's holding in *Mercadante* is consistent with the general rule that reliance consists of acting or refraining from action due to the inducement of defendant. *Channel Master Corp.,* 151 N.E.2d at 836, 176 N.Y.S.2d at 262 (fraud claim); *Home Mutual Ins. Co. v. Broadway Bank & Trust Co.,* 53 N.Y.2d 568, 428 N.E.2d 842, 846, 444 N.Y.S.2d 436, 440 (1981) (negligent misrepresentation claim) (citing *White,* 372 N.E.2d at 320, 401 N.Y.S.2d at 478).

*Mercadante* is still cited as good law. *See Metropolitan Life Insurance v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1525 (S.D.N.Y.1989) ("[D]isclosure-related common law fraud claims are not restricted to purchases and sales.") (citing *Mercadante*); *Weinberger v. Kendrick,* 698 F.2d 61, 78 (2d Cir.1982) (plaintiffs may claim misrepresentations caused them to hold securities) (citing *Mercadante*), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Defendants concede that, as of the time *Metropolitan Life v. RJR Nabisco* and *Weinberger* were decided, "*Mercadante* remained good law in New York, and the federal courts had no choice but to apply it." Defendants' Reply Memorandum at 11. This Court has no reason to believe that the New York Court of Appeals would overrule *Mercadante* if faced with the is-

---

**5.** Plaintiff cites *Duffy v. Smith,* 57 N.J.L. 679, 32 A. 371 (1895), for the proposition that "a plaintiff [can] recover damages for misrepresentation based upon holding the stock of a company for a long period in reliance upon the misrepresentation." Plaintiffs' Memorandum at 1. *Duffy,* however, involved a "purchase [which] was induced by a statement made by the defendant to the plaintiff...." 32 A. 371. Under those facts, the court held that the damages were to be measured from the time plaintiff made the investment. *Id.* 32 A. at 372. *Duffy* does not aid a plaintiff in a case, such as the present one, where the alleged misrepresentation did not induce the purchase of securities.

sue today. The Court concludes that, under New York law, a plaintiff may state a common law fraud claim against a defendant whose misrepresentations caused plaintiff to hold securities which plaintiff otherwise would have sold.

■ As an alternative to a purchase or sale requirement, defendants argue that plaintiffs should be required to allege some act preparatory to selling their stock. Defendants' Opening Memorandum at 19–20; Defendants' Reply Memorandum at 8–10. By requiring allegations of preparatory acts, defendants argue, the difficulties of proof inherent in a claim such as plaintiffs' are "confine[d] to a more tolerable level." Defendants' Opening Memorandum at 19. The case cited in support of this approach is *Fottler v. Mosley*, 179 Mass. 295, 60 N.E. 788 (1901), in which the Supreme Judicial Court of Massachusetts considered whether plaintiff's failure to sell his stock constituted reliance. Plaintiff in *Fottler* had given a sell order to defendant, who then made misrepresentations in order to induce plaintiff to withdraw the order, which he did. 60 N.E. at 788. The court then stated that if plaintiff would have refrained from selling the stock in the absence of defendant's misrepresentations, he did not rely on those misrepresentations. *Id.* at 789. However, reliance does occur "where the person defrauded does not do what he intended and started to do, and would have done, save for the fraud practiced upon him...." *Id.* The court concluded that if plaintiff withdrew his sell order and then held his stock instead of selling it because of defendant's misrepresentations, then plaintiff has alleged reliance. *Id.*

It is not clear whether plaintiffs' recall of his sell order determined the outcome of *Fottler*. However, the allegation of a preparatory act, even if required by *Fottler*, was apparently abandoned in *David v. Belmont*, 291 Mass. 450, 197 N.E. 83 (1935). In *David*, the judge charged the jury as follows with respect to damages:

> [I]f the untrue statements were made with the intent that the plaintiff should act upon them by refraining from selling his stock and he did so act, he would be entitled to damages measured by the difference between the market value of the stock at the time the statements were made and the market value when he discovered they were untrue....

197 N.E. at 84. The Supreme Judicial Court, "[r]eferring to a similar situation in *Fottler v. Mosley*," upheld the charge. *Id.* 197 N.E. at 85. The facts do not allude to any preparatory act, such as the recall order in *Fottler*. Although the *David* is essentially a damages case, it tends to erode the factual distinction between *Fottler* and the present case.

In the absence of a high court case in New York on the requirement of an act preparatory to sale, the Court will forecast the decision of the New York Court of Appeals. *See McGowan*, 759 F.2d at 291. Defendants point out that in *Mercadante*, 222 A.D. at 182, 225 N.Y.S. 488, plaintiff had notified defendant of his intention to sell if the issuer's financial ability to pay deteriorated. Defendants' Opening Brief at 19. However, there is no indication that the *Mercadante* court depended on this fact in any way in deciding plaintiff had stated a claim. *See also Metropolitan Life v. RJR Nabisco*, 716 F.Supp. at 1525 (plaintiffs survived summary judgment motion; court did not discuss any allegation of preparatory act). Moreover, there is little difference between the *Mercadante* plaintiff's concern for the financial condition of the bond issues and the ongoing interest that the plaintiffs herein expressed in Howard's financial condition. In any event, defendants do not argue that the New York Court of Appeals would today follow *Fottler* and the Court has no other basis to believe it would. Therefore, the Court holds that the New York Court of Appeals would not impose a preparatory act element.

### 2. New Jersey Law

■ No New Jersey court has decided whether a plaintiff can state a claim for securities fraud or negligent misrepresentation when the reliance alleged is plaintiff's failure to sell securities. No intermediate level appeals court has considered the

issue, even to the point of issuing dicta. Following the teaching of *McGowan*, the Court will forecast what the Supreme Court of New Jersey would decide if presented with plaintiffs' claim. 759 F.2d at 291.

Our point of departure is "the reluctance which New Jersey courts have manifested to dismiss innovative tort claims without full development of facts at trial." *Becker v. Interstate Properties*, 569 F.2d 1203, 1206 (3d Cir.1977) (citations in footnote omitted), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978);[6] *see also Dewey v. R.J. Reynolds Tobacco Co.*, 121 N.J. 69, 100, 577 A.2d 1239 (1990) (holding that refusal to immunize cigarette makers from liability was "consistent with the general policy in New Jersey of liberally favoring jury resolution of defectiveness issues in product liability cases") (quotation omitted).

Although plaintiffs' fraud claim is novel in that it presents a case of first impression under New Jersey law, it is within the general rule that inaction induced by a misrepresentation establishes the reliance element in a fraud claim. The Restatement (Second) of Torts § 525 provides, with emphasis added, that "[o]ne who fraudulently makes a misrepresentation ... for the purpose of inducing another *to act or refrain from action in reliance* upon it, is subject to liability to.the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." *See also* Restatement (First) of Torts § 525 (fraud involves misrepresentation made for purpose of "inducing another to act or refrain from acting in reliance").

In the absence of a decision by the New Jersey Supreme Court applying or rejecting this rule, the Court will determine whether the court would adopt it. The public policy underlying the actionability of fraud exists regardless of whether plaintiff is induced to act or refrain from action. Lies which deceive and injure do not become innocent merely because the deceived continue to do something rather than begin to do something else. Inducement is the substance of reliance; the form of reliance—action or inaction—is not critical to the actionability of fraud.[7]

Likewise, in a negligent misrepresentation case, when a person breaches a duty to another, the law will not inquire into the form of plaintiff's reliance. The Superior Court, Appellate Division, has indicated that inaction can constitute reliance in a negligent misrepresentation claim. *Kende Leasing Corp. v. A.I. Credit Corp.*, 217 N.J.Super. 101, 524 A.2d 1306, 1315 (App. Div.), *cert. denied*, 108 N.J. 664, 532 A.2d 242 (1987). In *Kende*, the court rejected plaintiff's claim of detrimental reliance on the rationale stated in a negligent misrepresentation case in which the court held that plaintiff failed to establish that he acted or failed to act in reliance on defendant's negligent misrepresentation. *Id.* (following *Home Mutual Ins. Co.*, 428 N.E.2d at 846, 444 N.Y.S.2d at 440). Given these "indicia," the Court holds that the Supreme Court of New Jersey would decide that, as a general rule, reliance in a fraud or negligent misrepresentation claim consists of action or inaction induced by a misrepresentation.

■ In order to escape the general rule, defendants argue that certain policy considerations militate against its application to plaintiffs' securities claim. Absent a purchase or sale, defendants argue, difficulties of proof open the door to speculative and

---

**6.** *Becker* illustrates the vicissitudes of predicting state high court decisions. In *Becker*, the Third Circuit Court of Appeals held that the New Jersey Supreme Court would have held that, in a personal injury case by a subcontractor's employee against the contractor, the employee could recover when the contractor had failed to engage a solvent subcontractor. 569 F.2d at 1209. The Superior Court, Appellate Division, has rejected this holding. *Cassano v. Aschoff*, 226 N.J.Super. 110, 116–17, 543 A.2d 973 (App. Div.), *certification denied*, 113 N.J. 371, 550 A.2d 476 (1988). Although *Becker*'s holding may ultimately be adopted by the New Jersey Supreme Court, the history of *Becker* shows that a when a federal court divines state common law, it is merely writing in the sand.

**7.** This discussion has nothing to do with the justifiability or reasonableness of the reliance, or the duty, if any, to investigate the accuracy of the representation.

abusive claims. Defendants' Opening Memorandum at 14–16. Defendants urge that these policy considerations can be accommodated by requiring a purchase or sale element in claims of common law securities fraud. However, defendants do not cite any case in which any court has barred a common law claim on the basis of these policy concerns. Indeed, defendants have not cited any case denying a common law securities claim because plaintiff did not allege a purchase or sale of securities.

Rule 10b–5, 17 C.F.R. § 240.10b–5, prohibits misrepresentations "in connection with the purchase or sale of any security." A plaintiff who has neither purchased nor sold securities in reliance on a misrepresentation may not maintain a private action under Rule 10b–5 for money damages. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 755, 95 S.Ct. 1917, 1934–35, 44 L.Ed.2d 539 (1975) (following *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)). Defendants argue that the policy considerations which supported the Supreme Court's holding in *Blue Chip Stamps* are persuasive in the common law context.

The Supreme Court apparently disagrees. In *Blue Chip Stamps,* the Supreme Court reviewed the criticism of the commentators and the Securities and Exchange Commission that a purchase or sale requirement for a private 10b–5 claim constitutes "an arbitrary restriction which prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of 10b–5." *Id.* 421

U.S. at 738, 95 S.Ct. at 1926–27 (citations omitted). The Supreme Court conceded that it "had no doubt that this is indeed a disadvantage of the *Birnbaum* rule.... Obviously this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law." *Id.* 421 U.S. at 738 & n. 9, 95 S.Ct. at 1927. Thus, although the Supreme Court went on to affirm the *Birnbaum* rule in the 10b–5 context, it recognized that the rule was sometimes unjust and that the lack of a common law *Birnbaum* rule was a salutary antidote to that injustice.[8]

A close reading of *Blue Chip Stamps* reveals, moreover, that the type of fraud alleged in this case is within the Supreme Court's understanding of actionable common law fraud. *Blue Chip Stamps* involved a class of plaintiffs who failed to purchase stock, allegedly in reliance on defendants' representations. 421 U.S. at 727–28, 95 S.Ct. at 1921. The Supreme Court pointed out that, "in the ordinary case of deceit," a misrepresentation which induces a failure to purchase or sell is as actionable as one which induces a purchase or sale. *Id.* at 744, 95 S.Ct. at 1929 (citing *Butler v. Watkins,* 13 Wall. 456, 20 L.Ed. 629 (1872)). The Supreme Court considered the typical fraud context to be on in which the parties knew each other and the alleged misrepresentations occurred through direct communication. In contrast, privity or even personal contact between the parties is rare in the securities market, and generally corporate representations reach "the readership of the daily newspapers." *Id.*

---

**8.** The Fourth Circuit Court of Appeals has held that the purchase or sale requirement applies when a plaintiff alleges a Rule 10b–5 violation as the predicate offense in a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim. *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 151 (4th Cir.1987) (holding that policy considerations discussed in *Blue Chip Stamps* merit imposition of requirement). Although the court did not consider whether a common law claim was subject, as a RICO predicate offense, to a purchase or sale requirement, *id.,* it declared that the considerations addressed in *Blue Chip Stamps* "pertain to all securities fraud actions." *Id.* at 153. The Ninth Circuit Court of Appeals has held that a purchase or sale is not required when a 10b–5 violation is alleged as a RICO predicate act. *Securities Investor Protection Corp. v. Vigman,* 908 F.2d 1461, 1466–67 (9th Cir.1990) (holding that RICO, unlike 10b–5, has a legislatively-created remedy not to be restricted by courts). These conflicting cases do little to help resolve the issue before this Court. The dictum in *International Data Bank* that the policy considerations discussed in *Blue Chip Stamps* pertain to all securities actions, 812 F.2d at 153, is refuted by the Supreme Court's own statement that the existence of common law claims without a purchase or sale requirement attenuates the injustice resulting from the imposition of the requirement in 10b–5 claims. 421 U.S. at 738 & n. 9, 95 S.Ct. at 1927.

421 U.S. at 745, 95 S.Ct. at 1930. Given the large class of potential plaintiffs whose fraud cases will necessarily depend largely or exclusively on their own oral testimony, the *Birnbaum* rule will "limit the class of plaintiffs to those who have at least dealt in the security to which the prospectors, representation, or omission relates." *Id.* 421 U.S. at 747–48, 95 S.Ct. at 1930–31.

One critical feature of the present case is generally absent from the securities market as described in *Blue Chip Stamps.* Plaintiffs had direct dealings with defendants in which the latter made certain of the representations complained of. Complaint ¶¶ 31–32, 41–42, 52; *see also* ¶¶ 40, 51 (allegations of misrepresentations made by individual defendants to plaintiffs' investment advisor). This case is, therefore, an "ordinary case of deceit" as characterized by the Supreme Court in that defendants made representations directly to plaintiffs. *See Blue Chip Stamps,* 421 U.S. at 744, 95 S.Ct. at 1929. Such a case could not be brought by anyone who happened to own Howard stock at any time from April to December of 1989. Although defendants are immune from 10b–5 liability, they should not be immunized from common law liability merely because their alleged fraud occurred in the securities market rather than the real estate or used car market.

The Third Circuit Court of Appeals has discussed the difference in scope of a 10b–5 claim and a common law fraud claim under New Jersey law. *Landy v. FDIC,* 486 F.2d 139, 168 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).[9] In *Landy,* the Court of Appeals examined the significance of Rule 10b–5's requirement that actionable misrepresentations be made "in connection with the purchase or sale of any security":

> To the extent that the 'in connection with' requirement narrows liability to less than the foreseeable class of injured persons, rule 10b–5 liability is constricted to a smaller field than common law liability. The common law extends a defendant's liability for 'fraud' to all those persons whom he should reasonably have foreseen would be injured by his misrepresentation. Although common law precepts are important guideposts in defining liability under the federal securities laws, they are not determinative.

486 F.2d at 169 (citations omitted). The above-quoted passage from *Landy* relates to Rule 10b–5's "in connection with" requirement that defendants intend to make representations that would influence the investing public, *id.* at 168, rather than its "purchase or sale" requirement that plaintiffs buy or sell stock in reliance on those representations. However, both requirements narrow the scope of a 10b–5 claim relative to a claim under the common law of fraud. *Cf. Weinberger,* 698 F.2d at 78 (New York common law securities claim, unlike Rule 10b–5 claim, without purchase or sale requirement).

In the absence of a decision on point from any New Jersey court, this Court will not impose a purchase or sale requirement. The Court, like defendants, seeks to avoid abusive, sparsely documented claims. Nevertheless, the Court is willing to risk such claims where, as here, plaintiffs allege that misrepresentations were directed at them to their injury. Although the price of allowing cases like plaintiffs' to go forward may be that some such cases will unfairly waste the Court's time and the defendants' reputation and money, that is a price the common law has always paid.

For a federal court sitting in diversity jurisdiction to create a significant exception to the common law would manifest an unwarranted insensitivity to the courts and legislature of New Jersey, especially if that exception were based on policy considerations pertaining to a federal securities claim. In *Dewey,* the Supreme Court of

9. The common law fraud with which the Court of Appeals compared Rule 10b–5 in *Landy* was implicitly the common law of New Jersey. Although plaintiffs did not allege common law fraud in their complaint, they did assert other New Jersey common law claims, including negligent misrepresentation, against defendants. *Landy,* 486 F.2d at 144. The Court of Appeals did not affirm summary judgment against plaintiffs for failure to allege fraud. *Id.* at 170 n. 35. Thus, the common law considered was that of New Jersey.

New Jersey held that the Federal Cigarette Labeling and Advertising Act did not preclude state common law claims against cigarette manufacturers. 121 N.J. at 94, 577 A.2d 1239, and refused to immunize cigarette manufacturers on public policy grounds. *Id.* at 99, 577 A.2d 1239. In light of the recency and strength of the court's desire to have a much more novel and vulnerable case go to the jury, the policy considerations which defendants raise in this case are simply not strong enough to persuade this Court to alter the common law of fraud and negligent misrepresentation. Because the Court holds that there is no purchase or sale requirement under the law of either New York and New Jersey, there is no conflict, and the Court need not analyze the quality of the contacts of the interested states. *See Veazey,* 103 N.J. at 248, 510 *A.*2d 1187.[10]

Finally, the Court must decide whether the Supreme Court of New Jersey would require an allegation of an act, like the canceled sale order in *Fottler,* preparatory to sale. The advantage of such a rule is that it would avoid, to an extent, the difficulties of proof and potential for speculation presented by cases in which the plaintiff has neither bought nor sold securities. *See* Defendants' Opening Memorandum at 19; Defendants' Reply Memorandum at 9–10. Perhaps plaintiffs' case would be more compelling if plaintiffs had withdrawn a sale order. However, if an allegation of a withdrawn sale order or some other preparatory act were made an element of a fraud claim, then shareholders such as plaintiffs, who were allegedly subjected to a constant barrage of misrepresentations, *see* Complaint ¶ 73(a)–(h), would

not state a claim for fraud if the misrepresentations were so effective that they never had an opportunity to make an informed choice to sell. By requiring a preparatory act, this Court would thereby immunize persistent, preemptive fraud. This Court, standing in the shoes of the Supreme Court of New Jersey, will not impose a preparatory act requirement on a claim for securities fraud of the type alleged here.

Likewise, the Court will not impose a preparatory act requirement in a negligent misrepresentation claim such as plaintiffs'. Again, plaintiffs' case might compel more credibility if plaintiffs could allege that defendants' misrepresentations had induced them to recall a sell order. But regardless of whether defendants' misrepresentations were fraudulent or negligent, as plaintiffs plead alternatively, defendants should not escape liability because of the difficulties plaintiffs face in proving their case. Having allowed plaintiffs' fraud claim to go forward, the Court will not dismiss their factually similar negligence claim.

Because the law of New York and New Jersey are in agreement that no preparatory act is required, the Court need not analyze each state's contacts with the issue. Plaintiffs may bring their claims for securities fraud and negligent misrepresentation despite the absence of an allegation of a preparatory act.

## III. CONCLUSION

For the foregoing reasons, the Court will deny defendants' motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The Court will

---

**10.** The same substantive holding would result if this Court were to follow *Francis v. United Jersey Bank,* 162 N.J.Super. 355, 392 A.2d 1233 (Law Div.1978), *aff'd,* 171 N.J.Super. 34, 407 A.2d 1253 (App.Div.1979), 87 N.J. 15, 432 A.2d 814 (1981). In *Francis,* the Superior Court, Appellate Division, applied Restatement (Second) of Conflicts § 309, which provides that the law of the state of incorporation determines directors' and officers' liability to their shareholders, except where another state has a more significant relationship to the issue at hand. 162 N.J.Super. at 368–69, 392 A.2d 1233. In the present case, Howard is incorporated and has

its principal place of business in New Jersey, Complaint ¶ 2, and the individual defendants reside in New Jersey. *Id.* Although there are some contacts with New York, these relate mostly to plaintiffs. The duties of directors and officers to shareholders should not depend on the citizenship of individual shareholders. *See In re Orfa Securities Litigation,* 654 F.Supp. 1449, 1463–64 (D.N.J.1987) (in class action, applying law of New Jersey, the location of principal place of business and occurrence of acts complained of, instead of law of states of plaintiffs' residence).

also deny defendants' motion for a more definite statement pursuant to Rule 12(e).