**Affirmed in Part, Reversed and Rendered in Part, and Opinion filed December 4, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00028-CV

---

### NICHOLAS WHITE, MARK MOERSEN, TAURUS MANUFACTURING CO., AND OPTIMAS MANUFACTURING SOLUTIONS, INC., Appellants

**V.**

### ZHOU PEI AND SHAUN WHITE, Appellees

---

## NO. 14-13-00501-CV

---

### ZHOU PEI, SHAUN WHITE, MEL SMITH, AND JAMES CORBETT, Cross-Appellants

**V.**

### NICHOLAS WHITE, MARK MOERSEN, TAURUS MANUFACTURING CO., AND OPTIMAS MANUFACTURING SOLUTIONS, INC., Cross-Appellees

---

## On Appeal from the 151st District Court

# M A J O R I T Y   O P I N I O N

These consolidated cross-appeals stem from the breakup of a closely-held corporation. Appellants Nicholas White, Mark Moersen, Taurus Manufacturing Company, and Optimas Manufacturing Solutions, Inc. appeal from the trial court's judgment awarding damages to appellees Zhou Pei and Shaun White. In their first two issues, appellants challenge the legal and factual sufficiency of the evidence to support the jury's findings of fraud by nondisclosure and fraudulent transfer, the latter being an alternative ground supporting the judgment. In their third issue, appellants contend the trial court erred in its formulation of the damages questions in the jury charge. In issue four, they contest the sufficiency of the evidence supporting the breach-of-fiduciary-duty finding favoring Shaun. In issue five, appellants contend the trial court erred in refusing to apply a settlement credit. And, in issue six, they challenge the sufficiency of the evidence on tortious interference (another alternative basis for the judgment but involving a lesser amount of damages).

Zhou and Shaun raise two issues in their cross-appeal. In their first cross-issue, they contend that if this court determines that a settlement credit should apply, the proper amount is $150,000 and not $400,000 as found by the trial court. In their second issue, they assert the trial court erred in imposing sanctions against them. Zhou's attorney, Mel Smith, and Shaun's attorney, James Corbett, join in the second issue to contest the imposition of sanctions against them as well.

We reverse the portions of the trial court's judgment favoring Shaun on his

breach of fiduciary duty cause of action and awarding sanctions against Shaun and Zhou, and we render judgment that Shaun take nothing on his breach of fiduciary duty claim. We affirm the remainder of the judgment.

## I.    Background

### A.  Introduction

This case concerns the breakup of Taurus Manufacturing, a closely-held corporation. The shareholders fell into opposing camps, and each side now tells a different tale. Nicholas White and Mark Moersen portray Taurus as failing and deeply in debt at the time of the breakup and maintain that they acted to protect the fledgling company's creditors and employees as well as the reputations of all of the shareholders. According to Shaun White and Zhou Pei, with Taurus on the verge of success, Nick and Moersen effectively sold the company to themselves to enjoy that success without sharing.

Zhou is a Chinese engineer who has worked with Shaun for many years. Shaun is a British engineer who owned either in full or in part several companies involved with manufacturing in the Far East, including Pan Industrials Singapore, Pte., Ltd.[1] Moersen is an American engineer who had worked previously with Shaun in China. Nick is Shaun's younger brother and, immediately prior to the formation of Taurus, was president and sole owner of Pan International, Inc., a company he incorporated at Shaun's request in the United States.

### B.  Creation and Early Years

In 1998, Zhou and Nick created Taurus for the purpose of contracting with

---

[1] Shaun is associated with multiple companies containing the word "Pan" in their names. Zhou also owns at least one of these companies. The apparent reason for the multiple, similarly-named companies was to have an entity registered in each of several countries to act as agents for American manufacturers seeking to export to those countries.

manufacturers in China to make products for commercial customers in the United States. Shaun and Moersen became Taurus shareholders in August 1999. Moersen made a $40,000 capital contribution when he became a shareholder. The same amount was contributed on Shaun's behalf by Pan Industrials.[2] Taurus was headquartered in Houston, and all four principals served on its board of directors. Additionally, Nick served as president and treasurer and was primarily responsible for sales and marketing in the United States. Moersen served as vice president and secretary and principally handled the company's finances. Zhou worked on product development and represented Taurus to Chinese manufacturers. Shaun played a more limited role, primarily assisting with product design. The four shareholders entered into an agreement with Taurus to defer their salaries until such time as Taurus was financially profitable enough to pay salaries, including the deferments.[3] Salaries began to be paid in October 2002, although the deferred salaries were never paid. Taurus frequently depended on the resources of Pan Industrials to underwrite its activities in China. At some point, the principals agreed that a debt to Pan for these services would accrue at a rate of $4,000 a month.[4]

In 2002, Nick sold 500 of his 2,000 shares to Sue Haig for $368 a share, and in early 2003, Shaun sold 250 of his 2,000 shares to Mike Smith for $328 a share. After these transactions, Zhou and Moersen each owned 25 percent of the outstanding stock, Shaun owned 22.5 percent, Nick 20 percent, Smith 2.5 percent,

___

[2] Neither Zhou nor Nick initially invested any money in Taurus. There was evidence, however, that all four principals subsequently contributed an additional $90,000 each as part of a "cash call" required to reimburse Pan Industrials for its having paid a Chinese supplier on Taurus's behalf. The sums for Zhou and Shaun were apparently "paid" by way of debt forgiveness by Pan to Taurus for those amounts.

[3] Zhou, Nick, and Moersen were to receive $8,000 a month in salary, while Shaun was to receive $4,000 a month due to his reduced role in the company.

[4] Shaun testified at trial that Taurus owed Pan $122,732.14 "on the books."

and Haig 5 percent.[5]

For several years, Taurus took orders from customers in the United States and arranged with Chinese manufacturers to produce and ship goods. The company was not yet making a profit annually, but the four shareholders and directors were optimistic that substantial profits were attainable. In July 2003, Moersen prepared a Taurus Business Plan to attract new investors. The Plan set forth past performance and projected future earnings, forecasting a $1.5 million profit for 2004, increasing each year to over $7 million by 2008. In his trial testimony, Moersen vouched for the validity of the Plan as of the time it was drafted, but he emphasized that it was based on certain assumptions, including that additional investment would be made and that the four principal shareholders would continue to be engaged in the business.

### C. Dissension

By late 2003 and early 2004, various issues began to surface. Shaun stated that he was concerned expenditure costs were growing too rapidly, in part because Nick had gone to China at some point and made changes that increased operating expenses. Moersen, on the other hand, stated that he had growing concerns during this timeframe regarding Taurus's debt. The key players began to split into the two camps that continued into this litigation, with Shaun and Zhou on one side and Nick and Moersen on the other.

In October 2003, Zhou had a stroke and underwent brain surgery in China. Her sudden lack of communication puzzled Nick and Moersen. Both men testified that they thought she had resigned from Taurus.

At the beginning of March 2004, Taurus owed debts to several creditors and

---

[5] British citizens Smith and Haig nonsuited their claims prior to trial and are no longer parties to this litigation.

the four principals (for accrued salaries). On March 2, 2004, a shareholders' meeting was called with the four principal shareholders in attendance along with Shaun and Nick's brother Jeremy White, who held proxies for the shares of Smith and Haig. At that point, Shaun and Zhou together owned 47.5% of the stock, Nick and Moersen together owned 45% of the stock, and Jeremy controlled the remaining 7.5%. Shaun testified that the meeting was called to discuss several topics, including Zhou's employment, paying creditors and accrued salaries, and conducting an audit of the company's books. During the meeting, the board of directors was unanimously reelected. The board of directors then met and reelected Nick and Moersen as officers. On the same day, Zhou's employment with Taurus was terminated, and Nick and Moersen refused to pay any of her medical bills.[6]

On March 10, 2004, Shaun emailed a proposal suggesting that Nick and Moersen could buy Shaun and Zhou out or vice versa, but the proposal was rejected.[7] Shaun called for a second shareholders' meeting on March 15, having convinced Jeremy to vote with him and Zhou.[8] Nick and Moersen, however, did not appear for the meeting, successfully preventing a quorum.

Around this time, the personal guarantees by the directors with their bank were due for renewal. Shaun notified the bank that neither he nor Zhou would guarantee additional Taurus debt. The bank closed Taurus's line of credit. Taurus

---

[6] Taurus provided medical insurance for Nick and Moersen but not for Zhou, apparently because her work was based in China.

[7] In April 2004, Moersen sent a counter-proposal offering to buy out a portion of Shaun and Zhou's stock at a greatly reduced price.

[8] Shaun was hoping to add another person, R. Sharma, to the board of directors in order to break the 2-to-2 deadlock. Nick and Moersen considered Sharma too closely allied with Shaun. Moersen stated that he and Nick were away on business when the second meeting was called, but he also acknowledged that part of the reason why they did not show was to prevent a quorum because they knew Jeremy intended to vote with Shaun and Zhou.

subsequently established new accounts with a different bank with personal guarantees by Nick and Moersen.

### D.  Transfer of Assets and Business

In late March 2004, Moersen incorporated a new company called Optimas Manufacturing Solutions, Inc. ("Optimas I"), with his wife and Nick's wife as owners, and offices located on the same floor of the same building as Taurus. Between May 18 and August 18, 2004, Taurus and Optimas I, without informing Shaun or Zhou, entered into a series of asset purchase and noncompete agreements whereby Optimas I obtained Taurus's assets and business. Moersen stated that he did not inform Shaun or Zhou because he feared they would interfere with the transactions. The total consideration stated in the agreements was $562,328, about $358,000 of which was assumption of Taurus's debt. The sale resulted in extinguishing most of Taurus's debts except the amounts owed to Pan and the accrued salaries. Moersen and his wife testified that they withdrew $150,000 from their retirement accounts to help pay for the asset purchases.

A key dispute at trial was whether Taurus received adequate consideration for its assets. According to Moersen, Optimas I overpaid for Taurus's assets to ensure that the debts to Taurus's creditors were paid. According to Shaun and Zhou, Taurus did not receive fair value because Optimas I took all of Taurus's business, not just its hard assets.

In May 2004, Nick and Moersen met with Trey Able, who was an owner in an investment company, Looper-Able, LLC (also apparently known as Infinity-DMT, LP), regarding possible investment by Looper-Able. They met again in July, and in August they agreed to form a new entity, Optimas Manufacturing Solutions I, LP ("Optimas II"), with Looper-Able, Nick, and Moersen each owning interests. Optimas II then purchased the assets and business of Optimas I. Able

7

testified that this was an unsuccessful investment for Looper-Able and that, while Nick and Moersen drew salaries from Optimas II, they did not receive any dividends. Nick and Moersen subsequently formed yet another entity, Optimas Manufacturing Solutions II, LLC ("Optimas III"), which in turn purchased the assets and business of Optimas II. As of the time of trial, Nick and Moersen were still involved with Optimas III, which had many of the same customers, employees, and offices as Taurus and was headquartered on the same floor of the same building. Additionally, Moersen had been drawing a salary of $12,000 a month from the consecutive entities since 2004.

Also in May 2004, prior to the first sale of Taurus assets to Optimas I, a lawyer representing Zhou sent letters to Moersen requesting information regarding the status and finances of Taurus. Moersen understood that her request was in contemplation of Zhou's making an offer to purchase Taurus. Moersen responded with some, but not all, of the requested information and documents, and he did not mention the asset purchase agreements that were to be effective within days, even though such information was clearly responsive to certain of her requests.[9]

### E. Lawsuits, Trial, Verdict, and Judgment

Taurus, still an entity although without business or assets, filed suit against Shaun and Zhou in June 2005. Shaun and Zhou then filed their own lawsuit, ultimately bringing claims against Nick, Moersen, Taurus, Optimas I, Able, Looper-Able, and Infinity (the latter three referred to hereinafter as "the Able Defendants"). Causes of action included breach of contract, tortious interference, fraud by nondisclosure, breach of fiduciary duties, fraudulent transfer, and

---

[9] For example, the second letter requested Moersen "[p]lease describe all potential contracts the company is working on." Zhou's attorney's second letter was dated May 11, Moersen's response was dated May 14, and the first asset purchase agreement was signed May 18.

conspiracy. The two lawsuits were consolidated by the trial court, and all of Taurus's claims were either dispensed with through summary judgment or nonsuited.

On the first day of trial, a settlement was announced pursuant to which Shaun and Zhou agreed to dismiss all claims against the Able Defendants in exchange for $150,000. Trial continued against the remaining defendants, and the jury returned a verdict primarily favoring Shaun and Zhou.

The jury found that Nick and Moersen interfered with the contractual relationship between Taurus and Shaun and Zhou to accrue salaries until Taurus was financially able to pay and, on this basis, the jury awarded Shaun $192,500 and Zhou $282,000. The jury further found that Nick and Moersen committed fraud by nondisclosure and awarded Shaun $692,500 and Zhou $782,000. Next, the jury found that both Nick and Moersen violated their fiduciary duties to Shaun as a creditor and awarded him $122,732. The jury additionally found that the transfer of assets from Taurus to Optimas I was fraudulent as to both Shaun and Zhou. For this, it again awarded Shaun $692,500 and Zhou $782,000.

Shaun and Zhou elected recovery under the fraud-by-nondisclosure findings, and the trial court awarded Zhou $782,000 and Shaun $692,500 in damages, jointly and severally, against Nick and Moersen. The trial court also awarded Shaun an additional $122,732 against Nick and Moersen based on their breach of fiduciary duties. The trial court awarded prejudgment interest on all sums, but refused to apply a settlement credit.

During post-trial proceedings, it came to light that Shaun and Zhou and the Able Defendants had entered into a second agreement, in which the Able Defendants agreed to pay the individuals $400,000 "in lieu of" the $150,000 stated

9

in the prior settlement agreement.[10]   Because of this revelation, the trial court determined that the actual settlement amount was $400,000 and not $150,000 and awarded $10,000 to Nick, Moersen, Taurus, and Optimas I as sanctions against Shaun, Zhou, and their two attorneys for misrepresenting the terms of the settlement.  The trial court, however, still declined to apply any settlement credit in the judgment.

## II.    Fraud by Nondisclosure

In their first issue, appellants challenge the legal and factual sufficiency of the evidence to support the jury's finding that appellants committed fraud by nondisclosure.  The evidence and argument presented on this cause of action revolved around the transfer of assets from Taurus to Optimas I and the failure to disclose that transfer to Shaun and Zhou.

The elements of fraud by nondisclosure are (1) the defendant failed to disclose material facts to the plaintiff that the defendant had a duty to disclose; (2) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (3) the defendant was deliberately silent when the defendant had a duty to speak; (4) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (5) the plaintiff relied on the defendant's nondisclosure; and (6) the plaintiff was injured as a result of acting without that knowledge. *Frankoff v. Norman*, No. 14-13-00162-CV, 2014 WL 4415206, at \*6 (Tex. App.—Houston [14th Dist.] Sept. 9, 2014, no pet. h.).  Appellants specifically argue that there is no or insufficient evidence (1) of circumstances giving rise to a duty to disclose the asset transfers under Texas law, (2) Shaun and Zhou suffered injury as a result of acting

---

[10] As will be discussed below, the second agreement was more complicated than set forth here.

without knowledge of the sale, or (3) supporting the specific elements of damages presented to the jury.

When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal-sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

### A. Duty to Disclose

As stated, Nick and Moersen first assert that there is insufficient evidence of circumstances giving rise to a duty to disclose the asset transfers under Texas law. A failure to disclose information will not support a fraud finding in the absence of evidence of a duty to disclose. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). The existence of a duty to disclose is a matter of law for the court to decide. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001); *Rivers v. Charlie Thomas Ford, Ltd.*, 289 S.W.3d 353, 359 (Tex. App.—Houston [14th Dist.] 2009, no pet.).[11] A duty to disclose may arise (1) when the parties have a confidential or

---

[11] The court's charge did not ask the jury to determine the existence of a duty to disclose. We therefore interpret the first argument under appellants' first issue as challenging the trial court's determination that they had a duty to disclose.

The charge defined fraud for purposes of the fraud by nondisclosure cause of action as follows; the definition presumes a duty to disclose existed:

11

fiduciary relationship; (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth; (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue; or (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to a duty to speak. *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.).[12] To support an action for fraud by nondisclosure, the concealed information must be material. *Bradford*, 48 S.W.3d at 754-55. Information is considered "material" if it is such that a reasonable person would attach importance to it and would be induced to act on it in determining his choice of actions in the matter. *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Fort Worth 2004, no pet.) (citing *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App.—Houston [14th Dist.] 1991, no writ)).

Nick and Moersen argue that the existence of a confidential or fiduciary relationship is required to support a duty to disclose. However, as indicated, such a relationship is but one of the situations under which the duty may arise.

---

Fraud occurs when—

a. a party fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

[12] Appellants argue that the only jury questions relevant to a duty to disclose involved the existence of a relationship of trust and confidence between the parties. These questions, however, were part of the submission on breach of fiduciary duties and not part of the fraud submission.

Shaun and Zhou detail evidence supporting the trial court's determination that Nick and Moersen had a duty to disclose. Nick and Moersen disclosed certain facts to Shaun and Zhou regarding Taurus's status and operating condition, creating the impression that Taurus was a going concern, which was not true, and thus obligated Nick and Moersen to disclose the "whole truth" concerning the company, specifically the approaching sale of its assets and business to Optimas I. *See Rivers*, 289 S.W.3d at 359; *Flood v. Katz*, 294 S.W.3d 756, 763 (Tex. App.—Dallas 2009, pet. denied).[13]

In May 2004, prior to the first sale of assets to Optimas I, Zhou's attorney sent letters to Moersen, as vice president of the company, requesting information regarding the status and finances of Taurus. In the preceding months, the four principal shareholders had discussed selling the company, and Moersen acknowledged at trial that he understood Zhou was considering making an offer. Shaun was copied on the letters and testified in detail regarding them at trial.

Moersen responded to the letters by supplying some, but not all, of the requested information and documents, and he specifically failed to mention the asset purchase agreements that were to be executed within days of the second letter, even though such information was clearly responsive. Moersen further acknowledged that Zhou was entitled to the information her lawyer requested and that Moersen was obligated to provide it. *See generally Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 696-97 (Tex. App.—Fort Worth 2006, pet. denied) (discussing shareholder's right to inspect corporate documents), *disapproved on other grounds by Ritchie v. Rupe*, No. 11-0447, 2014 WL 2788335 (Tex. June 20, 2014). Moersen also testified, during the same line of questioning,

---

[13] It has been pointed out that although "partial disclosure" and "voluntary disclosure" are typically listed as separate theories of fraud by nondisclosure, there appears to be no functional distinction between the two theories. O'Connor's Texas Causes of Action 295 (2012).

that Nick agreed with "each and every one of th[e] decisions" Moersen made on behalf of Taurus.[14] This evidence is sufficient to support the trial court's determination that Nick and Moersen had a duty to disclose the sale of assets and business from Taurus to Optimas I, as they provided incomplete information that created a substantially false impression and failed to provide the full truth concerning Taurus's status. *See Solutioneers Consulting*, 237 S.W.3d at 385.

## B. Resulting Injury

Nick and Moersen next contend that Shaun and Zhou failed to present legally or factually sufficient evidence that they suffered "injury as a result of acting without knowledge of the undisclosed facts," as required by the charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (explaining that in the absence of a relevant objection to the charge, sufficiency of the evidence is assessed in light of the charge as given). More specifically, in a single paragraph, Nick and Moersen argue that Shaun and Zhou produced no evidence that they took any action in reliance on the nondisclosure.

We disagree. The term "acting" in this phrase can encompass either affirmative action or abstention. Common law fraud damages can be established by evidence that fraudulent conduct induced a plaintiff's inaction and that the plaintiff was then injured by the failure to act. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 928 (Tex. 2010) ("Because '[i]nducement is the substance of reliance[,] the form of reliance—action or inaction—is not critical to the actionability of fraud.'") (quoting *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254, 264 (D.N.J. 1990)); *see also Formosa Plastics Corp. USA v. Presidio Eng'r & Contractors, Inc.*, 960 S.W.2d 41, 47

---

[14] The record shows that Nick was copied on at least one of Moersen's responses to the attorney's requests.

(Tex. 1998); *TCA Bldg. Co. v. Entech, Inc.*, 86 S.W.3d 667, 674 (Tex. App.—Austin 2002, no pet.); Restatement (Second) of Torts §§ 525, 531, 551. The term "acting" in the elements of fraud by nondisclosure and in the charge as given in this case encompasses action and forbearance. *See Frankoff*, 2014 WL 4415206, at *6.

Failing to disclose the transfer of Taurus's assets and business to Optimas I resulted in Shaun and Zhou's failure to take action to prevent or reverse it. Moersen made it clear in his testimony that the very reason that he and Nick did not disclose the sale to Shaun and Zhou was to prevent them from doing anything to stop it. Although Nick did not state the reason for nondisclosure as distinctly as Moersen did, the jury reasonably could have interpreted his testimony as implying the same motivation: to prevent Shaun and Zhou from doing anything to stop the transfer. Shaun's and Zhou's testimony likewise could have been reasonably interpreted by the jury as indicating that their not knowing about the transfer led them to continue to work out ways to buy out Nick and Moersen's shares in Taurus or otherwise divide up the company's assets rather than prevent the transfer. Zhou even testified that in August 2004, she solicited a bid from a vendor on behalf of Taurus, not knowing that the company was at that point no longer a going concern. The evidence therefore supports the jury's finding that Shaun and Zhou were "acting" without knowledge of the undisclosed facts.[15]

---

[15] The charge in this case followed almost verbatim the Pattern Jury Charge for fraud based on nondisclosure. Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—Business, Consumer, Insurance, Employment PJC 105.4 (2012). Accordingly, the charge stated only that "the party intends to induce the other party to take some action by concealing or failing to disclose the fact" and did not include a reference to inducement to refrain from action. *See supra* n.11. Nevertheless, "action" can encompass abstention. *See Frankoff*, 2014 WL 4415206, at *6. Appellants do not make any arguments based on this language in the charge.

15

## C. Damages

Nick and Moersen make arguments regarding the legal and factual sufficiency of the evidence to support the fraud-by-nondisclosure damages question and findings under both their first and third issues. We will group them together but discuss each argument in turn.

The Supreme Court of Texas has explained the Texas scheme of common law damages for fraud as follows:

> Actual damages are those damages recoverable under common law. At common law, actual damages are either "direct" or "consequential." Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. [¶]Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and result from it.

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (internal citations omitted). The damages found in this case are consequential in nature, which required proof that they were foreseeable and directly traceable to the fraud. *See Formosa Plastics*, 960 S.W.2d at 49 n.1.

Nick and Moersen contend that there is no evidence or factually insufficient evidence to support any of the measures of damages the trial court instructed the jury to consider: (1) the amounts Zhou and Shaun invested, if any, to fund Taurus's operations, (2) the fair market value, if any, of their shares, and (3) the amounts owed to them as accrued salary, if any. Nick and Moersen primarily argue that because all of the referenced actions—investment, purchase of shares, agreement for salaries to accrue on the books—occurred *before* the alleged

16

nondisclosures, they could not have been the result of Shaun and Zhou acting without knowledge of an undisclosed fact. However, the jury was entitled to consider whether one or more of these elements was foreseeable and directly traceable to the wrongful act of appellants. Each of the listed elements represents value or interest Shaun and Zhou may have had in the continuing existence of Taurus which was lost when Taurus was essentially rendered defunct and its assets sold off without compensation to them.

Specifically regarding their investment, Nick and Moersen additionally insist that the evidence at trial demonstrated that Shaun and Zhou did not actually invest any money in Taurus, but instead, their purported investment was in reality debt forgiveness by Pan Industrials. It was acknowledged at trial that both the original investment for Shaun and the subsequent cash call of $90,000 each from Shaun and Zhou came either directly from Pan or by way of debt cancellation. However, Shaun testified repeatedly and without contradiction that Pan contributed these amounts on behalf of Zhou and himself. Indeed, Shaun and Zhou received credit for these investments, as they received Taurus stock and were not required to contribute an additional $90,000 to match the amounts allegedly contributed by Nick and Moersen. Nick and Moersen offer no citations to evidence or legal authority disputing these assertions, *i.e.*, that although the cash or other value came from Pan, it was on behalf of Shaun and Zhou.

Under their third issue, Nick and Moersen contend that the trial court abused its discretion in submitting the fraud-by-nondisclosure damages question and the fraudulent-transfer questions. The elements of damages in the charge were the same for both claims. As to fraud by nondisclosure, Nick and Moersen repeat the same arguments of legal and factual insufficiency as just discussed. The other arguments under this issue do not relate to fraud by nondisclosure. Because we

conclude there is sufficient evidence to support the jury's answer, we likewise find sufficient evidence to submit the question to the jury. A judge must submit a requested jury question if it is raised by the pleadings and supported by some evidence. Tex. R. Civ. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992).

Finding no merit in any of Nick and Moersen's legal and factual sufficiency or charge submission challenges to the fraud-by-nondisclosure theory of recovery, we overrule their first issue and their third issue as it relates to fraud by nondisclosure. Because the jury's findings on this theory of recovery support the trial court's judgment awarding Shaun $692,500 and Zhou $782,000, we need not address Nick and Moersen's second issue, in which they challenge the findings on fraudulent transfer as an alternative ground supporting the judgment; their third issue, as it relates to fraudulent transfer; or their sixth issue, in which they challenge the tortious-interference finding as another alternative basis for the judgment. Accordingly, we overrule these issues as well.

## III.    Breach of Fiduciary Duty

In their fourth issue, appellants contest the legal and factual sufficiency of the evidence supporting the jury's findings that Nick and Moersen breached fiduciary duties that they owed to Shaun as a creditor of Taurus.[16] The first question in the charge related to this cause of action asked whether Shaun or Zhou was a creditor of Taurus, as follows:

---

[16] Generally, officers and directors of a corporation stand in a fiduciary relationship with the corporation and not with its creditors; however, when a corporation becomes insolvent and ceases doing business, its assets become a trust fund for the benefit, primarily, of its creditors, and the officers and directors owe a fiduciary duty to the creditors, breach of which gives rise to a cause of action for the creditors against the officers and directors. *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 628 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ.).

18

# QUESTION NO. 31

Were either of the following persons a creditor of Taurus at the time of the injury producing act or acts, if any and at a time when Taurus was insolvent?

You are instructed that the word "creditor" means one to whom money is owed.

You are instructed that a corporation is presumed to be insolvent if it is generally not paying its debts as they become due.

Answer "Yes" or "No". [sic]

Answer      Zhou Pei:            No

Answer      Shaun White:      Yes

The jury also found that Moersen and Nick breached their fiduciary duties to Shaun as a creditor and awarded him $122,732 in damages. In its final judgment, the trial court awarded Shaun this amount in addition to the amount discussed above for fraud by nondisclosure.

Nick and Moersen first specifically argue that there is no evidence to support the finding that Shaun was a creditor of Taurus as to the alleged debt. We agree. We begin our analysis by noting that the amount awarded is, to the dollar, the amount of outstanding payables Pan Industrials demanded from Taurus in March 2004.[17] Shaun and Zhou suggest three possible bases for the jury's findings: (1) the accrued salary Taurus allegedly owed to Shaun, (2) the amount of the original investment and subsequent cash call Pan made on Shaun's behalf, and (3) the debt owed to Pan. Regarding the first two possible bases, appellees point us to no evidence of an amount in the range of the award. *See Citizens Nat'l Bank of Tex.*

---

[17] According to testimony and documentary evidence, Taurus's books showed a debt to Pan of $122,732.14 at that time.

*v. NXS Const., Inc.,* 387 S.W.3d 74, 83 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[T]he jury may not 'pull figures out of a hat.'  However, it is well-settled that, when the evidence supports a range of values, as opposed to two distinct options, a finding within that range is an appropriate exercise of the jury's discretion.").  Moreover, if the award were based on Shaun's accrued salary and investments, those damages were awarded under the fraud-by-nondisclosure cause of action and Shaun may not recover the same damages twice.  *See generally Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (discussing the "one-satisfaction" rule).  The third proffered basis—the debt to Pan—also does not support the award because it was not a debt to Shaun.

Shaun and Zhou suggest that because there is evidence Pan was Shaun's company, any debt owed to Pan was actually a debt owed to Shaun.  Shaun and Zhou, however, did not plead any basis for recovering a debt to Pan.  Although Shaun testified at one point that Pan was his company, he filed suit only in his individual capacity, not on behalf of Pan.  *Cf. Gagan v. Murphy*, No. 13-13-00284-CV, 2014 WL 4402212, at *3 (Tex. App.—Corpus Christi Aug. 29, 2014, no pet.) (mem. op.) (holding evidence was legally insufficient to support damages awarded to owner of company who sued only in individual capacity based on contract entered into by company); *Emmett Props., Inc. v. Halliburton Energy Servs., Inc.*, 167 S.W.3d 365, 371 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding shareholders had no right to bring suit for damages to corporation in their own names).[18]  Moreover, while Shaun indicated that Pan's paying the initial

---

[18] As we explained in *Emmett Properties*:

> A cause of action for damages to the property of a corporation is vested in the corporation.  A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong.  An action for damages to corporate property must be brought by the corporation for obvious reasons:  to avoid multiplicity of suits and so that any

investment amount and the subsequent "cash call" were for his benefit, at no point did he allege that he had capacity or standing to collect any amounts owed to Pan in his own name and for his own benefit. His demands to Taurus for such payment were made expressly on behalf of Pan. Shaun and Zhou offer no legal basis for awarding amounts owed to Pan to Shaun.

The evidence may have established a debt to Pan, but there is no evidence of any debt to Shaun in the range of the amount awarded, or of his capacity or standing to recover on behalf of Pan. Consequently, we sustain Nick and Moersen's fourth issue, reverse the award of $122,732 to Shaun, and render judgment that Shaun take nothing on his breach-of-fiduciary-duty claim.

## IV.  Settlement Credit

In their fifth issue, Nick and Moersen contend that the trial court erred in refusing to apply a settlement credit to reduce the amount of the judgment entered against them. As discussed above, the trial court determined that the settlement between Shaun and Zhou and the Able Defendants was for $400,000, but the court declined to apply a settlement credit in the final judgment. Nick and Moersen initially argue on appeal, as they did in the trial court, that application of the settlement credit was mandated by section 33.012 of the Texas Civil Practice and Remedies Code. As Nick and Moersen point out, that section, when applicable, requires the trial court to reduce the amount of damages awarded to a claimant on a particular cause of action "by a percentage equal to the claimant's percentage of responsibility" as well as "by the sum of the dollar amounts of all settlements."

recovery will be available to pay the corporation's debts. Even though stockholders may sustain indirect losses, they have no independent right to bring an action for injuries suffered by the corporation. For corporate injuries, a stockholder is required to file suit on behalf of the corporation.

167 S.W.3d at 371 (internal citations omitted).

21

Tex. Civ. Prac. & Rem. Code § 33.012(a), (b); *Galle, Inc. v. Pool*, 262 S.W.3d 564, 571 (Tex. App.—Austin 2008, pet. denied).

However, as Shaun and Zhou point out on appeal and emphasized to the trial court, Chapter 33 expressly applies only to "any cause of action based on tort [or the Deceptive Trade Practices—Consumer Protection Act] in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." Tex. Civ. Prac. & Rem Code § 33.002(a); *see also F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 687 (Tex. 2007) ("Chapter 33 . . . governs the apportionment of responsibility in cases within its scope."); *Onyung v. Onyung*, No. 01-10-00519-CV, 2013 WL 3875548, at *11 (Tex. App.—Houston [1st Dist.] July 25, 2013, pet. denied) (mem. op.) (holding Chapter 33's provisions concerning proportionate responsibility did not apply where jury was not asked to assign proportionate responsibility for the harm determined to have occurred); *Barnett v. Home of Tex. & Warranty Underwriters Ins. Co.*, Nos. 14-09-01005-CV, 14-10-00197-CV, 2011 WL 665309, at *7 n.11 (Tex. App.—Houston [14th Dist.] Feb. 24, 2011, no pet.) (mem. op.) ("[C]hapter 33 generally governs cases involving 'proportionate responsibility' among liable parties, wherein persons are held responsible for percentages of the harm[.]"). There was no finding in this case that the Able Defendants, or anyone other than Nick and Moersen, were responsible for a percentage of the harm for which relief was sought. Therefore, Chapter 33's provisions concerning proportionate responsibility did not apply and the trial court did not err in refusing to apply a settlement credit under the dictates of section 33.012.

In their reply brief, Nick and Moersen additionally suggest that the trial court was required to apply a settlement credit pursuant to the "one-satisfaction" rule. In situations where Chapter 33 or another statutory settlement credit scheme

is inapplicable, the common law one-satisfaction rule may require a trial court to reduce a damage recovery based on a settlement. *Galle, Inc.*, 262 S.W.3d at 573. The rule embodies the proposition that "a plaintiff is entitled to only one recovery for any damages suffered." *Casteel*, 22 S.W.3d at 390. However, to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a). To preserve a complaint about a judgment for appeal, a party must inform the trial court of its objection by a motion to amend or correct the judgment, a motion for new trial, or some other similar method. *E.g., Diggs v. Diggs*, No. 14-11-00854-CV, 2013 WL 3580424, at \*11 n.17 (Tex. App.—Houston [14th Dist.] July 11, 2013, no pet.) (mem. op.).

During oral argument in this case, both sides represented that no request, objection, or motion was made in the trial court seeking application of a settlement credit based on the common-law one-satisfaction rule as opposed to provisions of Chapter 33.[19] Moreover, the trial judge explained on the record below that he rejected a settlement credit in this case not based on any language in the settlement agreements, but based on the legal arguments supplied by Shaun and Zhou's counsel, *i.e.*, that Chapter 33 did not apply because there was no finding of proportionate responsibility in this case. Accordingly, we find that the question of whether the common-law one-satisfaction rule entitled Nick and Moersen to a

---

[19] Shaun and Zhou's counsel made note of these representations in a post-submission letter brief, to which Nick and Moersen filed no response. A review of Nick and Moersen's post-trial filings and arguments—including a motion for application of settlement credit, post-trial briefing, and motion for new trial—reveals that Nick and Moersen consistently urged the trial court to apply a credit under Chapter 33 and made no request pursuant to the common law one-satisfaction rule. Although Nick and Moersen mentioned the one-satisfaction rule, it was clearly only to point out that section 33.012 "is intended to effect the 'one-satisfaction rule'" and not to request a settlement credit pursuant to the common law rule.

settlement credit in this case was not preserved for appellate review. *See Barnett*, 2011 WL 665309, at *6-7 (refusing to allocate settlement credit in part because defendants did not preserve the issue with a timely request, objection, or motion); *Bass v. Walker*, 99 S.W.3d 877, 889 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding defendants failed to preserve issues for appellate review concerning two different settlement credits, with the result being defendant received lesser amount for one credit and zero for other credit); *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 619-20 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (holding defendant failed to preserve arguments regarding alternative settlement credits, with the result being defendant received no settlement credit).[20] Accordingly, we overrule Nick and Moersen's fifth issue.[21]

## V. Sanctions

Shaun, Zhou, and their attorneys Corbett and Smith are pursuing a cross-appeal in which they challenge the trial court's imposition of sanctions against them. As discussed above, on the first day of trial, a settlement was announced between Shaun and Zhou and the Able Defendants, settling all claims for $150,000. During post-trial proceedings, it came to light that there was a second agreement between Shaun and Zhou and the Able Defendants, in which the Able

---

[20] Nick and Moersen further waived this contention by not making it in their initial appellate brief. *See, e.g., Powell v. Reiswerg*, No. 14-12-00776-CV, 2013 WL 5883807, at *4 n.4 (Tex. App.—Houston [14th Dist.] October 31, 2013, no pet.); *Swaab v. Swaab*, 282 S.W.3d 519, 527 n.10 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd w.o.j.). Although Nick and Moersen mentioned the one-satisfaction rule in their original brief, they did so only in suggesting that Chapter 33 "effectuates the 'one satisfaction rule' by preventing a claimant from obtaining a double recovery for the same injuries"; they did not argue in that brief that the trial court erred in not applying the common law rule.

[21] Because of our resolution of this issue, we need not consider Shaun and Zhou's first conditional cross-issue in which they contend that if this court were to determine that a settlement credit must apply, the proper amount would be $150,000 and not $400,000 as found by the trial court.

Defendants agreed to pay Shaun and Zhou up to $400,000 "in lieu of" the $150,000 stated in the settlement agreement. Because of this revelation, the trial court determined that the actual settlement amount was $400,000 and not $150,000 and awarded $10,000 to Nick, Moersen, Taurus, and Optimas I as sanctions against Zhou, Shaun, and their attorneys.[22] The trial court, however, still declined to apply any settlement credit in the judgment.

## A. Governing Law

The decision of whether to impose a sanction is in the trial court's discretion and will be disturbed only upon a showing of an abuse of that discretion. *Citibank, N.A. v. Estes*, 385 S.W.3d 671, 674 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In reviewing the trial court's ruling, we are not bound by the trial court's findings of fact or conclusions of law concerning the ruling. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam). Instead, we independently review the entire record to determine whether the trial court abused its discretion. *Id*. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles or its action was arbitrary or unreasonable under the circumstances of the case. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). There must be a direct connection between the improper conduct and the sanction imposed. *Id*. Also, the sanction must not be excessive. *TransAm. Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

In their motion, Nick and Moersen requested sanctions under either section 82.061 of the Texas Government Code or the trial court's inherent sanctioning authority. Although the trial court did not specify the legal basis for its sanctions

---

[22] In its order, the trial court stated that the sanctions amount was "reimbursement for attorneys' fees incurred in prosecuting this Defendants' Amended Motion for Sanctions and related Motions."

order, other than granting the motion, it is unlikely that the order was premised on section 82.061, as that provision authorizes the disciplining of attorneys through fines and imprisonment, and not an award of attorney's fees against both attorneys and parties, as the trial court did here. *See* Tex. Gov't Code § 82.061.[23]

Trial courts possess inherent power to impose sanctions for bad faith abuse of the judicial process even when the specific conduct is not covered by a rule or statute. *Ezeoke v. Tracy*, 349 S.W.3d 679, 685 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The scope of a trial court's discretion in this context is limited by the recognition that this power exists to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts, including hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgment, and enforcing its judgments. *See In re Tex. Dep't of Family and Protective Servs.*, 415 S.W.3d 522, 529 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding); *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). To invoke the court's inherent power, there must be some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of these powers. *See McWhorter*, 993 S.W.2d at 789. A party who makes misrepresentations to the court interferes with these core functions. *Funderburgh v. Funderburgh*, No. 12-08-00428-CV, 2010 WL 2982906 at *3 (Tex. App.—

---

[23] The provision provides as follows:

**§ 82.061  Misbehavior or Contempt**

(a) An attorney at law may be fined or imprisoned by any court for misbehavior or for contempt of the court.

(b) An attorney may not be suspended or stricken from the rolls for contempt unless the contempt involves fraudulent or dishonorable conduct or malpractice.

Tex. Gov't Code §82.061.

Tyler July 30, 2010, no pet.) (mem. op.); *see also Sims v. Fitzpatrick,* 288 S.W.3d 93, 106 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (affirming sanctions based on misrepresentations).

## B. The Two Agreements

Here, the trial court justified the imposition of sanctions by including the following finding in its order after holding several hearings on the issue of sanctions:

> The Defendants have established that Plaintiffs Zhou Pei and Shaun White, acting individually and by and through their counsel, attorney[s] Mel Smith and James Corbett, failed to disclose and misrepresented the existence, terms and conditions of the settlement between Plaintiffs, on the one hand, and the Able Defendants, on the other hand. By doing so, the Court hereby finds that Zhou Pei, Shaun White, and attorneys Mel Smith and James Corbett should be sanctioned.

This finding clearly references the fact that while counsel for Shaun and Zhou announced on the first day of trial that they had settled with the Able Defendants, counsel never revealed the signing of the second agreement with the Able Defendants, which occurred two days later, well before the end of trial and, of course, any post-trial proceedings.[24] Shaun and Zhou's counsel justify their failure to disclose the second agreement by insisting it was merely a "collection agreement," containing its own consideration, and not an amended or supplemental settlement agreement they would be required to disclose to the court and opposing counsel. *See generally* Tex. R. Evid. 192.3(g) (providing that "the existence and contents of any relevant portions of a settlement agreement" are discoverable). Nick and Moersen assert that the second agreement either was an amendment to

---

[24] Moersen apparently learned of the second agreement in a conversation with an employee of the Able Defendants.

27

the first agreement or superseded the first agreement, and thus, the amount of the settlement was actually $400,000 as stated in the second agreement.

In construing a contract, we seek to ascertain the parties' true intentions as expressed in the writing itself. *Ital. Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). To identify that intent, we consider the writing as a whole in an effort to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Id.*

The first agreement contains a mutual release of all claims in the subject lawsuit and mandates a payment of $150,000 from the Able Defendants to Shaun and Zhou. The agreement also contains a merger clause specifying that no promises had been made except for the express mutual covenants contained therein, and it contains a clause requiring that any amendment of its terms be in writing.

The second agreement, titled "Rule 11 Agreement,"[25] states that it concerns "the collections and shared distribution of proceeds from the Asset Purchase Agreement" between Optimas II and Optimas III. The terms of the second agreement expressly "control over the terms" of the first agreement. The second agreement further expressly states that "entry into this agreement shall be in lieu of the $150,000 payment agreed to in the settlement of the lawsuit between these parties."[26] Shaun and Zhou agreed that they would "not take any action that would interfere with the payments to be received by the [Able] Defendants" under the

---

[25] A "Rule 11 Agreement" is, by definition, an "agreement between attorneys or parties touching [a] pending suit." Tex. R. Civ. P. 11. Use of this terminology therefore suggests the agreement was made in connection with a pending lawsuit.

[26] In another place, the agreement states: "In lieu of the one-time payment of $150,000.00 by [the Able] Defendants to Plaintiffs agreed to in the [settlement agreement], the parties herein agree as follows . . . ."

Asset Purchase Agreement, through which the assets of Optimas II were sold to Optimas III. Shaun and Zhou further recognized the superiority and seniority of the Able Defendants' security interests that were granted by Optimas III in the Asset Purchase Agreement. For their part, the Able Defendants agreed to give Shaun and Zhou 26.66% of the monthly payments they were to receive from Optimas III under the Asset Purchase Agreement, up to a total of $400,000.

Unquestionably, the first agreement purported to settle all claims for $150,000. The claims were in fact released, but the money was not paid. The second agreement, in effect, modified the first, completely extinguishing the Able Defendants' obligation to pay Shaun and Zhou a flat $150,000, and instead, substituting an obligation to pay a contingent amount that could be zero or could be up to $400,000.[27] *See BACM 2001-1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 146 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("A modification alters only those terms of the original agreement to which it refers, leaving intact those unmentioned portions of the original agreement that are not inconsistent with the modification."). Shaun and Zhou's counsel's attempt to portray the second agreement as having no impact on the terms and conditions of the settlement is unavailing because the second agreement did exactly that—it changed how much Shaun and Zhou would actually receive in exchange for releasing their claims. In any event, the second agreement was not disclosed to the trial court and the other parties.

---

[27] The second agreement could also be viewed as an accord. *See, e.g., Am. Gen. Life Ins. Co. v. Copley*, 428 S.W.2d 862, 865 (Tex. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.) ("An accord is a new contract which the parties agree shall be a substitute for and discharge of an existing obligation. The performance of the new contract is a satisfaction of the obligation."). However, based on the language used in the two agreements and the addition of new obligations on both sides in the second agreement, it makes more sense to view it as a modification of the original agreement. Regardless of how it is characterized, our analysis would be the same.

## C. Propriety of Sanctions Against Counsel

With that in mind, we turn squarely to the question of whether the trial court erred in sanctioning Shaun and Zhou's counsel. Shaun and Zhou's counsel specifically argue that their conduct in failing to reveal the fact of the second agreement and misrepresenting the settlement amount did not significantly interfere with any of the trial court's core functions—such as hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgment, or enforcing its judgments. We disagree. At the time the second agreement was entered, throughout trial, post-trial proceedings, and even on appeal, the question of whether Nick and Moersen were entitled to a settlement credit has been hotly contested. Counsel's failure to inform the trial court and opposing parties of the modification to the settlement agreement and misrepresentation of the settlement amount prevented presentation and consideration of all of the facts and circumstances concerning this disputed issue.

Shaun and Zhou's counsel suggest that the fact the trial court determined that no settlement credit was applicable means that even if they should have divulged the existence of the second agreement, there was, in effect, no harm and no interference with any core functions. This determination as to settlement credit, however, has been in doubt throughout the proceedings, could have turned out differently; even now, this issue potentially is subject to discretionary review by the Supreme Court of Texas. Therefore, had the second agreement remained unrevealed, counsel's failure to disclose and misrepresentations regarding settlement could have resulted in a settlement credit being applied for the wrong amount in the trial court, in this appeal, or in a further appeal to the Supreme Court of Texas. *See, e.g., Dalworth Restoration, Inc. v. Rife-Marshall*, 433 S.W.3d 773, 788 (Tex. App.—Fort Worth 2014, pet. dism'd w.o.j.) (reversing and rendering

judgment because trial court erred in refusing to apply settlement credit). Settlement agreements are generally discoverable, and not just once a settlement credit is deemed to apply. *See* Tex. R. Evid. 192.3(g). Moreover, Shaun and Zhou's counsel overlook the significant harm inherent in their lack of candor to the trial court.[28] The trial court did not abuse its discretion in ordering sanctions under these circumstances as the attorney's bad faith conduct and making misleading statements to the court significantly interfered with traditional core functions of the Texas courts. *See McWhorter*, 993 S.W.2d at 789.

Shaun and Zhou's counsel further argue that the trial court may not sanction them under its inherent powers without first making a finding of bad faith. *See id*. Shaun and Zhou's counsel, however, cite no place in the record where they made this complaint in the trial court; it is therefore waived. *See* Tex. R. App. P. 33.1; *Pine v. Deblieux*, 405 S.W.3d 140, 150-51 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Moreover, although the trial court did not use the specific phrase "bad faith" in its order, that is the clear import of its findings regarding failure to disclose and misrepresentations. In addition to not reporting the second agreement, Shaun and Zhou's counsel—on at least two occasions after the second agreement was entered—represented to the trial court that the case had settled for $150,000. We conclude that the trial court did not abuse its discretion in finding counsel's misrepresentations to the trial court to constitute bad faith.

### D. Sanctions Against Shaun and Zhou

Lastly, cross-appellants argue that there is no basis for holding the parties,

---

[28] *See Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531 (S. D. Tex. filed Aug. 25, 2014, order) (ordering sanctions where attorney argued that any misrepresentations made to the court did not make a difference because they were not made in front of the jury) ("Beyond the effect on [other parties], the Court has an independent obligation to safeguard its own integrity and those of the proceedings before it.").

Shaun and Zhou, responsible for the failure to disclose the second agreement and misrepresentations regarding settlement. We agree. A just sanction must be directed against the abusive conduct with an eye toward remedying the prejudice caused to the innocent party, and the sanction must be visited upon the true offender. *TransAm. Natural Gas*, 811 S.W.2d at 917. A court must attempt to determine whether the offensive conduct is attributable to counsel only, to the party only, or to both. *Id.*[29]

The decisions made in failing to disclose the second agreement and misrepresenting the settlement amount were clearly based on legal analysis, and there has been no showing that Shaun or Zhou had any background to understand the propriety of or risks associated with the strategy undertaken. *Cf. Nath v. Tex. Children's Hosp.*, 375 S.W.3d 403, 410-11 (Tex. App.—Houston [14th Dist.] 2012) (holding sanctions were proper against party where party was shown to have significant prior experience in the legal system and was actively involved in the sanctionable conduct), *aff'd in part, rev'd and remanded in part on other grounds*, No. 12-0620, 2014 WL 4252269 (Tex. Aug. 29, 2014) (remanding to trial court to reconsider sanctions amount). Moreover, the actual statements made to the court regarding the fact and amount of settlement were made by counsel and not Shaun and Zhou. Accordingly, we reverse the portion of the sanctions order imposing sanctions against Shaun and Zhou but affirm the imposition of sanctions against their counsel, Corbett and Smith.

## VI. Conclusion

We reverse the portions of the trial court's judgment favoring Shaun on his

---

[29] Although *TransAmerican* concerned sanctions pursuant to Texas Rule of Civil Procedure 215 and not the court's inherent authority, it is generally instructive on the issue of sanctions. *See, e.g., In re N.R.C.*, 94 S.W.3d 799, 809-10 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

breach of fiduciary duty cause of action and awarding sanctions against Shaun and Zhou, and we render judgment that Shaun take nothing on his breach of fiduciary duty claim.  We affirm the remainder of the judgment.



/s/      Martha Hill Jamison
         Justice



Panel consists of Chief Justice Frost and Justices Boyce and Jamison (Frost, C.J., dissenting).